Fall River Whaling Company & others *vs.* Nathaniel B. Borden, Assignee.

Nathaniel B. Borden, Assignee, *vs.* Fall River Whaling Company & others.

Real estate, purchased and sold as merchandise, may constitute the substratum, either in whole or in part, of a copartnership.

In marshalling the assets of insolvent copartners, real estate, intended and treated by them as partnership property will go to the partnership, in preference to the several creditors, notwithstanding on the face of the deeds it is held by them as tenants in common at law.

If a partnership be proved to exist by any memorandum in writing or by the books and other written transactions of the parties, that will suffice to establish a partnership trust in lands, intended and treated by them as partnership property, however the lands be held in law, and will not be incompatible with the conditions of the Statute of Frauds.

Where land is purchased by two persons, and two dwelling-houses are built upon it in their joint name, but occupied by them separately, such land will not, because of any apparent confusion of their interests, be deemed in equity partnership property against the evidence of the legal title, unless there be other sufficient and independent proof of the existence of a copartnership.

PETITIONS to this court as a court of chancery under section 18 of the Insolvent Act, *St.* 1838, *c.* 163. The facts are stated in the opinion of the court, by

CUSHING, J. These cases have been submitted upon learned and elaborate printed arguments; and they came before the court in virtue of the general superintendence and jurisdiction conferred by the statutes for the relief of insolvent debtors, which empower us in all cases arising under those acts, and upon the petition of any party aggrieved in the premises, to hear and determine the matter as a court of chancery, and to make such order therein as law and justice shall require. 1838, *c.* 163, § 18. How far, precisely, the jurisdiction thus granted to this court extends, has not yet been decided. Suffice it to say, that the adjudged cases cover the present ones in their actual form, and therefore no question is made here as to the point of jurisdiction. *Harlow* v. *Tufts*, 4 Cush. 448, and cases there cited.

Besides which; looking beyond the question of form, the subject-matter of the several petitions here is such as to raise a question of implied trust; *Shaw*, C. J. in *Dyer* v. *Clark*, 5 Met. 577; and also one of copartnership, *Shaw*, C. J. in *Burnside* v. *Merrick*, 4 Met. 540; and thus indeed to bring the main point of these cases within the equity provisions of the Revised Statutes.

We are called upon to decide; First, the petitions of the Fall River Whaling Company, Theodore Cuyler, and others. presenting themselves as the creditors of John and Jesse Eddy, members of the commercial firm of "J. and J. Eddy," insolvent debtors, alleging certain property to be the assets, on the one hand, of John Eddy, and on the other of Jesse Eddy, the two copartners, and claiming the same property as such separate creditors: And secondly, the petition of Nathaniel B. Borden, propounding his views of the disposition of the same property, in the nature of an appeal from certain orders in the premises made by a master in chancery, marshalling the assets of "J. and J. Eddy," and of the individual copartners John and Jesse Eddy.

Upon these petitions, the report of the master, and the evi-

dence submitted therewith, we have to determine what destination shall be given to the proceeds of certain parcels of real estate held by John and Jesse Eddy prior to the time of their becoming insolvent. Borden, the assignee who represents in law both the partnership and the separate creditors, pretends that all the proceeds of the real estate are partnership assets, and to be distributed as such; the Fall River Whaling Company, Cuyler, and others argue, that they are all separate assets, and to be distributed accordingly; while the master has come to the conclusion that the property in controversy was partly separate and partly copartnership assets, thus indicating, what further inquiry will prove, the questionable condition of the property itself, and the dubious nature of the relations of John and Jesse Eddy.

The subject-matter of controversy consists of three distinct parcels of lands, situated in this county; and the shape in which the controversy comes up, requires that, for the discussion and ascertainment of their legal condition, these parcels of lands should be carefully distinguished. To this end, without going into superfluous details, we shall speak of them by the designation of the Hathaway, the Borden, and the Freelove estates, according to the name of the previous proprietors, from whom respectively they were purchased by John and Jesse Eddy.

1. The Hathaway Estate. In the opinion of the master, this land was separate property; the assignee appeals to us to overrule his opinion, and to determine it to be partnership property. The Hathaway property was bought by the two Eddys, on the 17th of August, 1826, by deed in ordinary form conveying the same to John Eddy and Jesse Eddy. On the face of the deed, therefore, and at law, the grantees are tenants in common of the land conveyed, and each party owns in fee one undivided moiety. *Non constat*, however, that the acts of the grantees have not made it subject to partnership equities; and such is the question now to be considered.

Whether, as a general question, real estate, in this commonwealth, which on the face of the title is held by the parties as tenants in common, may or not, under given circum-

stances, be treated in equity as partnership effects, is a question no longer open to debate. Upon very ample consideration of the provisions of the statutes *ad hoc*, which enact that, when two or more copartners become insolvent, their assets shall be marshalled, the partnership creditors proving their claims against the partnership property, and the separate creditors against the several property, the partnership funds to be applied to the partnership debts, the separate funds to pay several debts, and the surplus only, if any, after satisfying one class of claims, to be carried to the fund applicable to the satisfaction of the other, *St.* 1838, *c.* 163, § 21 ; and also upon consideration of the general doctrines of equity appropriate to the matter, the court has, in a series of cases, adjudged, that land, whatever the aspect of the legal title, may nevertheless be proved in equity to be part of the joint stock of a copartnership, and as such, liable to all the equitable conditions of partnership property; in which condition of things the land vests in each copartner, and the heirs of each, clothed with a trust for the copartnership, capable of being protected and enforced by the court through as well the general as the special equity powers created by the statutes of the Commonwealth.

The broad question was thoroughly discussed and deliberately settled in *Dyer* v. *Clark*, 5 Met. 562 ; *Burnside* v. *Merrick*, 4 Met. 537 ; and *Howard* v. *Priest*, 5 Met. 582, in all which cases one copartner asserted and established the equitable lien of the company in lands, the legal estate of which had by the death of the other copartner passed to the widow and heirs at law. That is but one of the categories of the question. Nevertheless, if the partnership equity may pursue the land after it has descended on the heirs at law, *a fortiori*, that equity may arrest the title in the hands of the copartners themselves, or of their assignee in insolvency, and to that effect is the reasoning of the court in the cases cited. That is to say, the court, in those cases, determined a principle of law ; they adjudged, at that time, one of the classes of cases comprehended within the scope of the principle, and the present question is but of another class referable to the same established principle.

39*

What calls for the judgment of the court here, then, is not the question whether land, ascertained to be partnership property, shall be subjected to the proper partnership equities, but the more special question, whether the Hathaway land was in fact the partnership property of the copartners J. and J. Eddy. If it was, then all the partnership equities attach.

This general inquiry involves two perfectly distinct elements, namely, first, the partnership character of John and Jesse Eddy; and secondly, the partnership quality of the land.

These are, in the first instance, questions of fact, in the determination of both of which we assume that the burden of proof is on the side of those who allege partnership and partnership property. As to persons, the law presumes them to be *juris individui*, as they were born, until the contrary be shown. As to land, the condition of that is, *primâ facie*, what the deed of grant or other muniment of title at law, indicates. These general presumptions of fact, in regard to either persons or things, are open to contradiction; but alleged change, either in condition or quality, must be proved by him who affirms it.

The time, also, to which the imputed character of the persons, or quality of the estate, shall be referred, may become, as will be seen, material to the main question.

Upon the whole evidence in the case, it is undeniable that John and Jesse Eddy have been at some period of time copartners. They were so confessedly at the date of the insolvency. But it does not distinctly appear at what determinate moment they became copartners. No written contract of copartnership in the case ever existed; it is a partnership provable by parol, by tacit approbation, or by the acts of the parties between themselves, their dealings with others, and the documentary writings and accounts of their business transactions. Such a copartnership is, of course, just as lawful as any other; but the nature of it is such as to leave the exact time of its commencement a subject of doubt.

Now, the question whether a specific parcel of property be partnership property or not, like the question whether certain parties are copartners or not, is in most cases a question

of intention. When two persons declare themselves to be copartners by a solemn contract in writing, or when, by such writing, they purchase or appropriate certain property for partnership property, their intention is no longer doubtful or uncertain. But, if they have not explicitly declared their intention as to either point, in writing, although the court will in most cases equally give efficaciousness to their intention, provided it can be satisfactorily ascertained, yet oftentimes it is difficult to do this.

In the present instance, the two brothers, John and Jesse, not only did not contract partnership by express written articles, but they differ in recollection as to the time of its commencement, and the facts themselves are, during the early period of their business history, ambiguous and questionable. Indeed, if the purchase of the Hathaway land was a partnership act, it was itself the first of the collection or concatenation of acts by which the parol partnership here is to be proved. Nevertheless, although this be the earliest of the acts from which it is pretended that copartnership is to be inferred, and although in itself alone inadequate to prove a copartnership, yet, as every series of acts, constituting when together a new legal relation, must have a beginning, it becomes necessary to follow down the business transactions of the parties to the time of their insolvency, in order to appreciate the character of this particular act, by its relation to other acts. Nay, perhaps the date of the insolvency, being substantially the dissolution of the active copartnership, is the true critical time as to the whole inquiry of the relation of the copartnership to the disputed property.

Proceeding under this apparent necessity of looking into the whole series of the business transactions of John and Jesse Eddy, we find, so far as can be discovered from the very imperfect evidence in the case, the following state of facts, namely:

In the year 1826, and from that year until the year 1834, John Eddy and Jesse Eddy were members of the firm of S. Shove and company, a copartnership engaged, as we are left to conjecture, principally in manufactures, Shove being copart-

ner for one half, and John Eddy and Jesse Eddy each for one fourth, but no part of the capital having been contributed by the Eddys.

In 1830, if not sooner, the Eddys, members of the firm of S. Shove and company, by the notes they gave in making purchases, the tenor and form of bills which they paid, their invoices of shipments and policies of insurance on vessels and merchandise, and their inventory and account books, are proved to have been commercial copartners by another and distinct firm, that of J. and J. Eddy; they, as individuals, still being members of the manufacturing copartnership of S. Shove and company.

In the year 1834, all the debts of the firm of S. Shove and company, were assumed by, and all its assets transferred to, the firm of J. and J. Eddy, the former company ceased to exist, and the latter continued to carry on the business of manufacture and commerce, until, in 1846, they instituted proceedings in insolvency under the statute, and the business of the firm terminated.

After the purchase of the Hathaway land, which, it will be remembered, was in the year 1826, the two Eddys caused to be constructed a double dwelling-house on the land, bid between themselves for the choice of the dwellings, entered upon separate occupation of the two houses with their respective families, and so remained until the property was sold by their assignees, leaving none of the estate in common, except a part of the land, back of the dwelling-houses.

The Hathaway land was, in the first instance, paid for by note. This note is mutilated by tearing off the signature, as often happens at the time of payment of notes; and it is argued in the case, from inspection of what remains of the writing, that the signature was by John Eddy and Jesse Eddy separately. We are not satisfied of this; on the contrary, the comparison of the note with another unmutilated note, on file, of near date, leads us to incline to a contrary conclusion. The money, with which to pay this note, was received by the Eddys from the funds of S. Shove and company. All the notes and bills, for the construction of the dwelling-houses

appear to have run in the joint name of J. and J. Eddy. The repairs were made, and the taxes were assessed and paid, some on separate and some on joint accounts. Additional improvements were made by each, in the part occupied by him as he saw fit. The property does not appear to have been, at any time, applied to commercial occupation or use. And no partnership dealings are proved between John and Jesse Eddy prior to the year 1830, unless the purchase of the Hathaway land, the construction of the two dwelling-houses thereon, and the occupation of that estate, constitute a co-partnership.

Now, upon these facts, and there are no others in the case of decisive importance, it is obvious to say, that none of the criteria of partnership property, which are specified in the cases heretofore decided by this court, are to be seen here. We cannot say that the purchase was made with partnership funds; because, whether it was so or not, depends on whether there was a partnership or not; and, whether there was a partnership or not, depends on whether it was a partnership purchase or not; and we come back immediately to the first question, and thus perceive that we are only reasoning in a vicious circle. Each proposition, whether partnership or not, and whether partnership property or not, depends on the other; the only way suggested of proving either of them is, to assume the other; thus we have no fixed premises, and of course have no reliable conclusions. So, as to another *indicium* of partnership property spoken of in the books, namely, the application of the property to partnership uses. To inquire for partnership uses presupposes a proved partnership, as the principal about which the incidents of use are to be grouped; but here, whether partnership or not, depends on the very question of the acquisition and uses of this very estate. But the adjudged cases, in which the question is merely whether partnership property or not, are of a partnership admitted or proved by evidence *dehors* the disputed property itself. A contract of copartnership; partnership funds; a partnership business, present or prospective, to which the property in dispute can be attached as a partnership incident. Such are the

conditions of proof in the authoritative cases reported. Here, there is no evidence of partnership funds, no partnership occupation, no commercial use, no partnership proved, of which to predicate the land as incident, or, by means of which to represent it as principal, even assuming that mere land may be held as the sole object or substratum of a copartnership.

If the purchase of the Hathaway estate can be deemed a partnership transaction in any sense, it is only *quoad* the act of purchase, and the construction of the dwelling-houses, and expires with the commencement of the divided use of the estate. But we cannot admit, that, for two persons to buy a piece of land as tenants in common, and then to build two separate houses thereon at joint expense, but to hold and occupy separately and without any contract of copartnership, written or parol,—we cannot admit that such facts constitute a copartnership.

We are of opinion, therefore, that the master proceeded correctly in treating the Hathaway estate as the several property of John and Jesse Eddy.

2. Of the Borden and Freelove Estates. We come now to a branch of inquiry, which involves a much more difficult class of questions, both of law and fact, appertaining to the other parcels of real estate, the Borden and Freelove lands, which may be considered together as one question, they not being, on the facts, any way distinguishable in their relation to the inquiry of whether partnership property or not.

There seems to be no reason to doubt that, from the year 1830, inclusive, to the term of their insolvency, J. and J. Eddy were, in fact, copartners. Their commercial transactions commenced at that period. Copartnership books, opening at that date, are in the case, as reported by the master. And a great amount of documentary evidence, filed in the case, removes all possibility of question as to this point.

The Borden land was bought by the Eddys at different times, in parcels, the first purchase being on the 21st of January, 1830, other parcels being obtained in 1831, 1832, and 1835, when the title became perfect in them. The Freelove estate was purchased on the 13th of April, 1833. In all these

deeds, the grantees are described as John and Jesse Eddy or John Eddy and Jesse Eddy, manufacturers.

Whatever may prove to be the construction of law, in regard to the tenure of these lands, it must be conceded, we think, that the parties treated them as copartnership property. That is to say, the cost of the purchase went into the partnership accounts. The estates were entered into the company books, as company property. As portions were sold for profit, from time to time, the proceeds were merged in the general funds of the copartnership. These lands were avowedly purchased on speculation, as it is called, that is, to be bought and sold as merchandise for the mere purpose of commercial gain by the transaction.

On the very surface of the inquiry, then, we perceive a distinction, between the Hathaway estate, on the one hand, and the Borden and Freelove estates on the other, in these respects, namely : First, no partnership is proved at the time of the purchase of the former, while it is proved at the purchase of the latter ; and secondly, that, while the former was not treated as partnership and commercial property, the latter was.

While these estates were undeniably treated as partnership property, in the specified particulars, yet still, it was not in the ordinary or superficial sense of property in lands, affixed to a partnership as an appendage, incident to, or instrument of commerce or manufactures. They were not the site, water privilege, or buildings of a mill, nor the wharf, magazine, or place of business of a merchant, nor the yard of a lumber dealer, nor the edifices and extensive grounds necessary for the conduct of some great branch of art, like the fabrication of gunpowder, the manufacture of machinery, or the construction of ships. Nay, it is not the case even of a great brewing house, owning country ale-houses, as the means of extending the sale of its ale and porter. *Phillips* v. *Phillips*, 1 Myl. & K. 649. It is real estate, constituting as such, if partnership estate, a substantive, independent subject-matter of copartnership, though not the sole one. Hence, all the arguments of counsel to the point of the alleged use of these ands for partnership purposes, and the inference that there-

fore, partnership property, are imperfect or inapplicable. In-stead of this limited question, we have to consider the general one, whether, and under what condition of proof, real estate as such may be made, in part or in whole, the specific substra-tum of copartnership. Without disposing of this question, we see no way to decide whether these lands were the prop-erty of John and Jesse Eddy or of the firm of J. and J. Eddy.

Whatever indisposition may exist in the minds of jurists, brought up in the school of the common law, to subject estates in land to commercial conditions, that step has already been made in this commonwealth, in respect of many rela-tions of the subject, by judicial construction as well as by statute. The quasi sanctity of character, which the feudal system gave to land as such, no longer exists. What remains of that class of ideas, however, is valuable, namely, the forms of conveyance and tenure, because of the stationary and stable character of the land, and because of the primary impor-tance of real estate in relation to the material interests of society.

In considering how far questions of dower and heritage should be permitted to exclude the application of trusts or any other equities to real estate, meanwhile, it is well to remem-ber, that all such equities have grown up in Great Britain itself, where the obstacles to their introduction, arising out of the feudal incidents of land, would seem to be more serious than they can be in the United States. It is not logical to take from England the common-law conditions of real estate, exclusively, and refuse all the equitable modifications of those conditions, which new social wants and habits have shown to be requisite even there, and by still stronger reason, here.

Now the doctrine of the application of partnership equities to real estate in this commonwealth, as we have already seen, is thoroughly settled here. And the new shade of question before us, at present, is, whether similar equities can be attached to land, when that land is a principal, not an inci-dent, so far as regards its connection with the copartnership.

As a question of principle, we cannot mistake the true

foundation of the doctrine. It is reasoned out by this court, with conclusive force, in the leading case of *Dyer* v. *Clark*. The ground of the partnership equity is the credit, obtained by a firm, expressly or constructively, as a company, on the faith of its company funds; from which it follows that, if the company funds be invested in real estate, and the purchase and sale of the real estate be mixed up with and blended in the partnership stock and dealings, then it is to receive the attributive trusts of copartnership property. Such is the explicit doctrine of *Dyer* v. *Clark*, which in principle applies, therefore, to a given parcel of lands which has been absorbed in the copartnership, though not used, like a storehouse or a distillery, as the agent merely of commercial transactions.

The precedents are in accordance with the principle suggested, in a multitude of cases, adjudged in Great Britain and the United States, and collected in various digests and treatises. See, especially, Collyer on Part. (Perk. ed.) § 135, and note. And the old cases in this Commonwealth, where intimations to the contrary of this occur, are suits at law, not in equity. This remark applies to whatever, if any thing, there may be in conflict with the above doctrine, in the case of *Pitts* v. *Waugh*, 4 Mass. 424.

What remains of serious controversy on the subject, is not, whether real and personal estate may not equally be the substratum of partnership which is now generally admitted; (Story on Contracts, 3d ed. § 212;) but whether a special agreement is needed or not; and if any agreement, how proved, in order to convert lands, being partnership property, into mere personalty so far as regards all its relations to the company, (3 Kent Com. 7th ed. 37,) and especially in reference to the question, as to which we say nothing, of its distribution as personalty or descent as land, after the decease of the copartners. See Collyer on Part. (Perk. ed.) §§ 136, 577.

Some of the English cases, in which the general doctrine has been gradually wrought out, deserve especial note: such as *Crawshay* v. *Maule*, 1 Swanston, 518, which was of lands, and mines of coal and iron ore, before Lord Eldon; *Fereday* v. *Wightwick*, 1 Russ. & Myl. 45, of surface lands and mines

in which Sir John Leach declares the principle to be, that "all property, acquired for the purpose of a trading concern, whether of a personal or real nature, is to be considered as partnership property, and is to be first applied accordingly in satisfaction of the demands of the partnership;" and *Dale* v. *Hamilton*, 5 Hare, 369, which last case will be particularly referred to in another stage of the investigation.

We see in the present case, it may be well to remember, conflicting equities; for the question does not arise here between the two copartners, or between one of them and the heirs at law of another, or between a copartner and his credi-ors, but between two sets of creditors, each set having, for aught which appears, equal rights in law. But there is no evidence in the case to show special credit to have been given to either John or Jesse Eddy severally, on account of any assumed separate interest in these estates; and there is some little evidence—that of David Anthony—to show that these lands entered into the consideration of the credit given to the copartnership of J. and J. Eddy. In addition to which, if it be needed to turn the nicely poised scale of equipollent consid-erations, is the fact of the actual merger of these estates by purchase and sale, both for a period of ten or fifteen years, in the funds and stock of the firm, and a consequent preponder-ance of equity in favor of the partnership creditors.

We decide nothing beyond the present case; but, on the facts here appearing, and the questions arising therefrom, we feel constrained to conclude that, in order to affect land with partnership equities, it is not necessary that such land should be the incident merely of a commercial copartnership, but that it may be in part, at least, the distinct substratum of a copart-nership. What should be the decision, if the partnership were of land and nothing else, it will be time enough to determine when the precise question arises.

There still remains, what is, after all, the straining point in law of the whole inquiry, namely, the relation of the subject to the Statute of Frauds. For, when we concede that land, which, on the face of the deeds of grant, is held by two copart-ners as tenants in common, may, nevertheless, be dealt with

in equity as a trust fund in their hands, for the use of their partnership creditors, the question then presents itself, by what evidence must the trust be proved, in relation to the Statute of Frauds?

The statute says that, " No trust concerning lands, excepting such as may arise or result by implication of law, shall be created or declared, unless by an instrument in writing, signed by the party creating or declaring the same, or by his attorney." Rev. Sts. *c.* 59, § 30.

Conflicting opinions, bearing on this point, that is, touching the question of the relation of the Statute of Frauds to partnership equities in real estate, have been put forth by most eminent judicial authorities.

Looking at the words of the statute, in the first place, if, in the case of any given copartnership, there be written articles of association, it would seem clear the statute is saved. But articles of copartnership are not recorded like deeds of land; it rarely happens, when such articles exist, that any exigency calls for the exhibition of them to third parties, who, in dealing with a firm, seldom stop to ask, or care to know, whether the copartnership subsists by parol or by indentures. Therefore, it may be assumed, that the reason of the statute, in this respect, is not for the purpose of giving notice to third parties of a trust affecting the land, in modification of the tenor of the title on the title deeds. This conclusion is confirmed by the reflection, that the provision of the statute of Charles (29 Car. II. *c.* 3) is the original of ours, and that no considerations of notice to contradict apparent title by registry of deeds, could have borne on the subject in England.

All the mischief, contemplated by the statute, we know, is what the tenor of the statute imports, namely, the prevention of frauds and perjuries. 1 Greenl. Ev. § 262. That is to say, the arguments of legal convenience, so far as they serve to guide us in the construction of the statute, are considerations of proof. If the trust be proved by a memorandum in writing, it is the required condition of the statute; if it be not, then we have to see whether the case falls within the exception as a trust by implication of law. In either view of it, the question

recurs : What proof of copartnership shall suffice to satisfy the demands of the statute ?

Observe, the thing to be proved is, whether, from 1830, inclusive, to 1846, the date of insolvency, there was a subsisting copartnership between John and Jesse Eddy. It is conceded, or if not conceded, we assume it as abundantly proved, that they were during all this period—and especially at the termination of its activity as a firm, which is the critical time—copartners. The question now is : How proved ? Whether by a memorandum in writing according to any established construction of that phrase in the Statute of Frauds ? If so, there will be no occasion to decide the extreme question, whether a copartnership, standing on mere parol, or on acts only, without even spoken words of contract, does or not raise an implied trust within the exception of the statute ; otherwise, to dispose of the present case, it will be necessary to decide that extreme question.

Now, it was long since adjudged in this commonwealth, upon the direct independent question, what shall be admitted as proof of declaration of trust, within the statute, that mere parol is insufficient ; *Walker* v. *Locke*, 5 Cush. 90 ; but that no solemn contract is necessary ; and any memorandum in writing, signed by the party sought to be charged with the trust, even a printed pamphlet admitting the material facts, will be held sufficient within the statute. *Barrell* v. *Joy*, 16 Mass. 221.

Consonant herewith is the rule in England, as laid down by an author of great credit on the subject, to the effect that " any thing in writing, decisively by marking the intention to create a trust, will be effectual without a formal declaration." Roberts on Statute of Frauds, 95 ; see also Hill on Trustees, by Troubat, 61.

In contracts of sale, a bill of parcels written by direction of the vendor, but not actually signed, has been decided to be a memorandum within that branch of the statute. *Hawkins* v. *Chace*, 19 Pick. 502 ; see also *Whitwell* v. *Wyer*, 11 Mass. 6 ; *Morton* v. *Dean*, 13 Met. 385.

There is, in the present case, no want of written documents,

in which John and Jesse Eddy sign as copartners, to say nothing of their books of account and schedules of partnership property, made by them or by their direction; some of which separately, and all of which together, would make out a much stronger case of memorandum in writing, than has been held to be requisite in not a few of the reported a·ljudications of our own or of other courts of law.   Story on Sales, ch. viii.

The consideration of the extremest possible case, and of the manner in which that has been decided in Great Britain and America, will serve, we think, to remove all doubt as to the true conclusion from the premises.

On the one side, is the following case : The plaintiff Dale, was a surveyor, and the defendant Hamilton, a capitalist. Dale, having been employed in surveys, appertaining to projected improvements on a vast scale, at Birkenhead, opposite to Liverpool, advised Hamilton as to the purchase of lands at Birkenhead on speculation, which lands, on the completion of the contemplated improvements, were greatly augmented in value.   Dale charged that, in consideration of the information to be given by him to guide in the selection, Hamilton, furnishing the capital, and taking the conveyance to himself, agreed to admit Dale to a partnership with him in the profit or loss of the speculation.   It was not pretended that Dale and Hamilton had any other business connection, and the only contract alleged was by mere word of mouth.   If a partnership, it was a partnership in land alone, and in this one act of purchase and sale, standing on parol merely, unsupported by any general partnership subsisting, or any collection and combination of general partnership writings and acts, and with no pretence of any partnership funds, either contemporaneously existing or subsequently acquired.   The defence was the Statute of Frauds.   Nevertheless, in this naked presentation of the question, Vice-Chancellor Wigram, on deliberate review of all the cases, decided that a copartnership being proved, though but by word of mouth, the equitable consequences followed, and partnership equities attached, the Statute of Frauds notwithstanding, the case being held to be

a trust by implication of law. *Dale* v. *Hamilton*, 5 Hare, 369.

On the other side is the following case : Smith, the plaintiff in equity, alleged that Burnham, the defendant, had agreed with him to form a copartnership in the business of purchasing and selling wild lands in the state of Maine, upon a joint capital to be furnished by both; that Burnham purchased land accordingly, taking the conveyance in his own name; which land the plaintiff sought to charge with trust as partnership assets under the pretended agreement of copartnership. There was not a single scrap of paper in the cause between the parties, alluding to, or in any manner whatever, touching the matter of copartnership ; all the allegations of the plaintiff's bill were denied in the defendant's answer ; and there was no proof of partnership, except in testimony of certain witnesses to imputed declarations of the defendant,—the whole so imperfect, loose, and obscure, as to afford no possible means of ascertaining the tenor and terms of the alleged contract of partnership. There were no partnership funds in the case, and no partnership dealings, other than the pretended executory contract for the purchase and sale of lands on speculation. In pronouncing his decision in the case, Mr. Justice Story, after reviewing the authorities, came to the conclusion, first, that there was no sufficient proof of a partnership even to affect the personalty ; and, in the second place, that there was nothing in the case to take it out of the range of the Statute of Frauds. *Smith* v. *Burnham*, 3 Sumner, 435. But, while so deciding in the case before him, Mr. Justice Story distinctly declared that, if there had been proof of the payment of part of the purchase-money for the land by the plaintiff, or if the land had been purchased out of the funds of an existing partnership, for partnership purposes, then he should have recognized a resulting trust, arising, by operation of law, within the exception of the statute. Ibid. 461-2

On a comparison of these two great leading adversary cases, then, it is obvious that the most recent one of *Dale* v. *Hamilton* goes much further than is requisite for the decision of the present question, and that the older one of *Smith* v. *Burnham*,

does not contradict, but, on the contrary, confirms the conclusion to which our examination of the whole subject tends, namely, that a partnership, satisfactorily proved, and certainly if proved by writings, is to be held as raising in equity a partnership trust in partnership lands, whatever the state of the legal title. If such writings of the copartnership refer directly to the land by name as partnership property, then the trust is proved by the statute memorandum; if the writings do not, by name, refer to the land, then it is a trust therein by implication of law. Such trust being established, whether it be considered as done by implication of law, or by virtue of writings amounting to the statute memorandum, however the title may stand at law, or in whatsoever name or names it may be, the real estate, belonging to the partnership, will be treated in equity as belonging to the company, like its personal funds, and distributable accordingly; the parties, in whose names it stands, as owners of the legal title, being held, in this case, to be trustees of the partnership. Story on Part. §§ 83, 92. And the partnership condition of the Borden and Freelove estates, we think, is proved sufficiently, so far at least as regards the thing to be done, which is only to marshal the assets of the insolvent debtors.

There is no question here between competing claimants of the land, as land, and, of course, no controversy as to title, or as to the relations of the statute of frauds to any collision of interest in real estate. All the land was lawfully sold by the assignee, who represented as well the separate partners, as the firm. We have only to direct the disposition of the proceeds of the land actually in the hands of the assignee, by determining what equities attached to it as between the two sets of creditors. We decide only the case before us, in affirming, in this respect also the master's report, which distributes the proceeds of the Borden and Freelove estates to partnership creditors of J. and J. Eddy.

*B. F. Hallett*, for the company.

*T D. Eliot*, for the assignee.

*Decree accordingly.*\*

\* See the next case.